Please call the next case. 111-3636, Weed Staffing v. Werner Workers' Counsel? Is the court? Counsel? Your Honor, if I may just reserve five minutes for rebuttal today, please. Yes. My name is Carolina Zielinska. I represent the appellant and respondent in this matter, Elite Staffing. Your Honors, there were five issues on appeal in this case. Those included accident, causation, the reasonableness and necessity of medical treatment, TTD, as well as permanency. I will not be addressing all five of those issues today. Today we'll be focusing on accident and causation, and we will stand on our briefs for the other three remaining issues. Your Honors, in this case, the arbitrator found that Petitioner sustained an accidental injury arising out of the course of her employment. And it is our position that the arbitrator and commission erred in this ruling. And it's our position because of two reasons. First of all, the timeline of events described in this particular case is questionable, and it's our position that it diminishes the credibility of the Petitioner. Secondly, the history, and this is the most important factor in this case, the history of injury provided by Petitioner is completely inconsistent with her medical treatment records. In fact, all of the treatment records in this particular case. Now, I submit to you that common sense itself raises a little bit of doubt in this case. Petitioner Lorena Lara Lopez alleges a date of injury on November 17th of 2008. The Petitioner claims that she sustained a traumatic work accident on this date when she was working on an assembly line. So essentially, Petitioner testified to the following. I was standing in an assembly line, it was a conveyor belt, and there were pieces of cardboard coming by this conveyor belt. She described them as heavy, wet. In fact, in the transcript itself, she stated it looked like a big mountain of cardboard. She attempted to take this cardboard off of the conveyor belt, and another piece of cardboard ended up striking her in the arm. She testified that she felt pain between her shoulder blade and her hand on her left side of the body. That was the testimony Petitioner gave at the trial. She also testified that this caused her a little bit of pain, and she continued working. So, we have to ask ourselves, is that reasonable? Is it reasonable that Petitioner was struck in the arm by a piece of cardboard and continued working? I submit to you that it is. It sounds pretty reasonable. You feel a little bit of pain, you continue your work day. And now, let's go a step further, which is what happened in this case. Because then Petitioner testified that in the next three days or so, her pain was progressing. It became worse and worse, and it was constant, to the point where Petitioner stated that she could not even turn her head to the left. She physically was not able to turn her head because her neck hurt that bad. So I ask Your Honors, is it reasonable that Petitioner had gotten to this point and had not seen a doctor? She didn't see the doctor the day after. She didn't see a doctor two days, three days, four days. It took her two weeks to go and see a physician when she's saying, I couldn't even turn my head. Let's discuss what happens when she does finally see a doctor, which is the second point in this case. The arbitrator found, and he specifically stated in his decision, in the Commission Affirmative Statement, stating that on December 1st of 2008, Petitioner sought medical treatment and provided a history consistent with her testimony at trial in regards to her injury. That's what the arbitrator found, consistent. I submit to you that that is completely inaccurate. If you look at the records in this case from the doctor at Markey Medicals, which was Dr. Grados, as well as every other physician she saw after that, the history states that Petitioner was working eight to nine and a half hours per day, that she was doing repetitive motions with her left hand, that she had to twist her body, that she had to twist her arm and pull with her arm. That is what she told the doctor. She told the doctor that sometime three weeks before this first visit of December 1st, which would take us to November 10th of 2008, that that was the first time she started feeling pain. Yet at trial, she's discussing a specific traumatic incident with cardboard, saying it's heavy, saying it's wet, saying it struck her in the arm. When she goes to the doctor, it's a repetitive injury, and she doesn't even complain of arm pain. Obviously the Commission, it's within their province to judge the credibility of the witnesses and the weight to be given to the testimony. So they believed Ms. Lopez, do they not? It appears, yes, Judge, it appears that the arbitrator believed that Ms. Lopez was credible. What is not an issue of credibility, I submit to you, is the fact that the records state what the records state. If every single piece of medical treatment record says November 10th, date of injury, pulling, twisting, and none of them, none of them, not one, have causation, traumatic injury, November 17th, cardboard. The word cardboard isn't in any of these records, but that's what Petitioner is testifying to. So even though the judge said, okay, she's credible, she's credible in the sense of, yes, this cardboard hit me. But the records don't pertain to that. The records don't relate to that statement. Didn't her treating physicians, don't the records of the treating physicians support her treatment, support her condition? No, Judge, it does not. An injury to the left arm is a left arm injury. What Petitioner ended up having treatment for in this case is a cervical disc bulge that appeared on an MRI. We do not know where this disc bulge came from. None of the causation opinions in this case say Petitioner struck by cardboard. That ended up being a disc bulge. There's no connection here whatsoever. It's just we have an injury that's supposedly to the left arm, and then we have an opinion saying her disc bulge is related to her injury. But no discussion of what injury that would be. Every record simply says injury November 10th, injury November 10th. That wasn't even what Petitioner testified to. She testified to the 17th. At the end of the day, we have two different dates of injuries, two different body parts, two different accounts of what happened, and no causation opinion for Petitioner. It is an inconsistent statement. The records are contradictory, and arbitrations and the commission's decision in saying that they ruled the way they did because the treatment records are consistent with her testimony is simply inaccurate. Did the commission make a credibility finding regarding Dr. Bernstein's opinion? Both the arbitrator and the commission, yes. They said that they believed the treaters and Petitioner over Dr. Bernstein and the U.R. reports. So they did make that. The commission said that Dr. Bernstein was not credible, correct? That's what they said, correct. But saying that the treaters are credible. What do you expect this court to do about that credibility finding? If the court doesn't trust Dr. Bernstein, and that's the determination that they made, I'm not asking you to overrule that. What I'm simply saying is you don't believe Dr. Bernstein, fine. You don't believe the U.R.s., fine. But you said you believe the medical records, but you're not following what they say. If you believe the medical records, then please look at what they say. They say November 10th injury. They do not say anything in regards to causal connection opinion as to the 17th. They don't say anything in regards to an injury to the left arm from a conveyor belt. They simply say she started having pain sometime at work. I'm going to say November 10th, because that's what she told the first physician on December 1st, and they led with that, and that's what flowed from doctor to doctor to doctor, from pain management specialist, from the physical therapy, to Dr. Pond, every other physician in this case. So I agree with the judge. If that's the determination they made, credibility-wise, I will stand by that. But they're not following the medical records. That is our position in this case. I have nothing further, unless Your Honor has any questions for me. Thank you, counsel. Good afternoon. My name is Brenton Schmitz, here on behalf of the petitioner Lorena Lara Lopez. May it please the court, counsel. The appellant has presented a lot of questions, five questions. All of these questions are questions of fact, and you'll notice that there's one thing that the appellant didn't say throughout the entire oral argument. Three simple words. Standard of review. I won't stand here for ten minutes and lecture this panel on the standard of review. I'm sure you all know it much, much better than I do. Well, obviously, it's a manifest way. We can only reverse the commission in a situation where the opposite conclusion is clearly apparent. We can always agree on that. How do you answer her overarching question? She's saying that, yes, you have medical records that were submitted, but there's a disconnect between the medical records and the claimant's testimony of the injury and the treatment and how everything happened. So how do you respond to that? She's saying, yeah, there's medical records, but they don't only support, when you look at them closely, the claimant's position. Well, I fully agree with Your Honor that there is something of a disconnect on its face. There appears to be a bit of a disconnect between the initial intake notes of Dr. Gattis and the petitioner's testimony at trial. Let's take a look at what Dr. Gattis actually wrote down. Dr. Gattis wrote that petitioner has a repetitive job working on a conveyor belt. That's true. We all have acknowledged that. Respondent acknowledges that. Dr. Gattis writes that the petitioner's pain to her neck and her left arm began approximately three weeks ago, on or about November 10, 2008. Okay. Approximately three weeks, on or about the 10th. All right. So as far as when the pain started, we're about a week off. I submit that that's not particularly unrealistic in light of the circumstances. For the petitioner's recollection to be off by on or about a week does not raise a grand question in my mind as to what she's talking about. Would this situation have been better if Dr. Gattis had written down the specific mechanism of injury? Absolutely. As it stands, Dr. Gattis didn't write it down. The petitioner testified at trial that she gave the specific mechanism of injury, specifically a pile of carb or striking her on the left side of her body, causing her to violently twist. She testified that she gave that to Dr. Gattis at that initial date of service. It's right there in the transcript. Would this all be a lot easier if Dr. Gattis had written it down? Absolutely. Now, there are a couple of other histories in the record. There's the history taken by Dr. Spurtevik. There's the history of Dr. Bernstein. Both of those state relatively similar things. She's got a repetitive job. She had, and using Dr. Spurtevik's words, there was an acute onset of neck, back, shoulder, and arm pain. Now, that's not gradual onset. That's acute onset. Of course, Dr. Spurtevik gives us the repetitive job description, and unfortunately, she doesn't give us the specific mechanism of injury. What else have we got? Dr. Bernstein. Petitioner worked at this facility, Waste Management, for approximately six months. It was typical conveyor belt line work. She began to experience pain and had a work-related injury on November 10, 2008. Now, Dr. Bernstein doesn't tell us where he gets that history. He doesn't tell us if he's interviewing the petitioner and the petitioner provided it to him, or if it's coming from the treatment records that Dr. Bernstein reviewed. So I submit it's not clear, based on the record, whether Dr. Bernstein is taking his own independent history or whether he's simply relying on the histories previously taken by Dr. Gaddis. We don't know. Now, none of this is very inconsistent. Is there a difference between a gradual onset repetitive trauma injury and a specific trauma injury? Absolutely. In this case, however, Petitioner testified that what she experienced was a specific trauma event, a specific trauma event resulting in what has been called by every doctor in this case a two to three millimeter disc bulge at the C5-6 level of her cervical spine. Everybody admits that that's what's on her cervical spine. According to Gano Electric, International Harvester, I don't need a specific causal connection opinion from a doctor if I can show the following. If I can show that the petitioner was working full duty and had no prior injuries to the specific body part, then suffered a trauma to that body part, and then was unable to work and had a condition of ill-being, we can infer, the Court can infer, in this case the Commission did infer, that the specific trauma was what caused the condition of ill-being. So you're going with what is referred to as a chain of events, correct? Absolutely, Your Honor. To which you might counter, well, you have the chain of events, but then you have the medical testimony that seems to be inconsistent with that. So you just totally disregard the medical testimony? How do you reconcile, I guess, within the manifest weight standard, the inconsistencies? I don't disregard the medical testimony. I think the medical testimony is very important. In this case, we heard from, in the records, no doctors were deposed. We heard in the records from Dr. Smirnovich, Dr. Bernstein. Now, nobody ever wrote down the specific traumatic incident, it appears from the records. However, there's no doubt that either a specific trauma event or a repetitive trauma event could cause the level of disbulging we're seeing. And this is exactly why we have the manifest weight standard of review and accord such great deference to the Commission with regards to these factual issues. It is the province of the Commission to resolve factual issues, especially regarding conflicting medical testimony. And in a situation such as this, we defer to the Commission's great expertise and decades of experience in dealing with conflicting medical testimony. Let's not lose our head over that. So what is the body part? What we're talking about here is the neck, Your Honor. It's a level of the cervical spine. Right, right. But where was she actually, where was the point of impact in her injuries? According to the Petitioner's testimony, she was wrestling with a pile of wet cardboard on a conveyor belt when a second pile from the left came up on the belt, struck her on the left side of the body, causing her to violently twist around. That was the testimony that she gave at trial. Shelton also testified that she immediately notified her supervisor, Francisco Vasquez, of the accident, and that Mr. Vasquez moved her to a different position off the line for the next two weeks of work. Mr. Vasquez, unfortunately, was unable to testify, but the Commission found the Petitioner's testimony to be absolutely credible with respect to what happened. So it's the violent twisting that led to the cervical spine injury, right? Correct, Your Honor. It's your theory, anyway. It is, Your Honor. It was my theory, and I believe that to be exactly what the Commission had in mind when they made their findings as to the credibility of the doctors, the credibility of the Petitioner, and exactly what the diagnosis is. Arbitrator DeVrent spelled out exactly what the diagnosis was in his decision. C56, bulging disc. He told us right there in his causal connection section. Well, that just talks about the body part that's injured, right? It does. Okay. So I guess it's trying to get from that back as to how that could have occurred. Well, as we've said before, under the chain of events theory, we know that the Petitioner was fine and working full duty prior to the accident. She suffered a violent twisting of her body on the left side, and afterwards she had an MRI about a month later that showed a significant disc bulge at C56. She also had a positive EMG test that showed that the nerve root at C56 was being impinged on the left side, was being pushed on by that bulge. The Petitioner testified that prior to the date of accident in question, she had no symptoms or no problems of any kind with her cervical spine or her left arm. And the Arbitrator personally viewed that testimony and found the Petitioner to be credible when she gave it. With regard to the other issues, specifically the medical bills, TTD, permanency, I will follow the example of counsel and rely on the brief for those. If there are any other questions, I'm happy to address them. Did the claimant say that this was a violent collision with this cardboard? You used that term. Is that the adjective the claimant used? I used the term violent. I'm not sure if that comes straight out of the transcript. I'd have to review exactly what the testimony was. Does it matter? Would it matter if the condition was violent or not? For purpose of your argument? For purpose of my argument, I don't believe that the collision with the pile of wood cardboard had to be violent. Certainly it had to be strong enough to cause an injury to the cervical spine, but the cervical spine can be injured in almost imperceptible ways. Things that we would not look at as a very, very traumatic incident can cause cervical spine bulges. Again, this is something that the Commission deals with on a daily basis, and which is why we accord them such great deference in determining causal connection on these issues. So if it's just a twisting, that would be sufficient? I believe it would, Your Honor. I don't believe there are any further questions. Thank you, Counsel. Thank you very much. You may reply. Your Honor, to answer your question, the transcript states the word jolt. She was jolted. There was no violent twisting. The word violent doesn't appear anywhere in this record. Counsel, Dr. Bernstein rendered an opinion that the claimant suffered a cervical strain, right? Yes. So, I mean, even your own examining physician didn't say no causal connection, just a different degree of injury? In terms of her history provided, the petitioner provided a history to the doctor. The doctor, based on that history of repetitive motion or what have you, stated that it appears she had cervical strain. He did not have an MRI report at that time to go off of. So there was no opinion on the respondent's side that there was no causal connection either? There was not, no. So nobody had a causal connection? I can agree with that. Everybody just put the medical in and commission decided? Yes, Your Honor. Now, as far as counsel's theory in terms of plausibility and, you know, looking at the chain of events, that would be fine. However, that's not what happened here. The commission decision, as well as the arbitration decision, clearly states that the nature and the mechanism of injuring this case was the cardboard hitting petition on the left side. The petitioner spelled that out in his decision. So we cannot stand here now and argue, well, that they must have inferred these chains of events, because that's not the case. That's not what the decision says, and that's not what the commission affirmed. Finally, I just want to point out, counsel mentioned that petitioner stated on direct examination that she did tell Dr. Grados about this injury, but he did not write that down in his history. Okay? That would make sense. However, we have notes from this doctor who told only an injury to her neck, not her arm. She filled that out herself and initialed next to it. And we have evidence that this doctor, based on the history provided to him, then went and did radiological testing. And that testing was on her cervical spine and her thoracic spine. So if this individual told him huge chunk of violent cardboard hit me,  X-ray of the arm? X-ray of the shoulder? MRI of the shoulder? That is not the history she gave him because that's not what happened in this case. For those reasons, your honors, I ask that you reverse the arbitration and the commission decision, in this case finding causal connection and accident and injury. Thank you for your time. Thank you, counsel. This matter will be taken and revised in this position. We'll stand at brief recess.